**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| BRIAN SHROPSHIRE, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| BANK OF AMERICA | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT/PETITION

COMES NOW Plaintiff, BRIAN SHROPSHIRE (hereinafter "SHROPSHIRE"), by and through the undersigned attorney and sues Defendants, BANK OF AMERICA, N.A., a Foreign Corporation (hereinafter "BOA"), and in support thereof would show as follows:

## NATURE OF ACTION

1. Plaintiff SHROPSHIRE brings this action against BANK OF AMERICA in connection with its unlawful conduct in failing to terminate private mortgage insurance ("PMI") in accordance with the requirements of his mortgage as well as its failure to properly credit payments and amounts charged.

2. Plaintiff seeks relief under 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536; (2) Sections 807(2)(a), 807(10), and 808 of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e(2)(a), 1692e(10), and 1692f (the "FDCPA"); (3) Sections 6 and 19 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2605, 2617, and the regulations promulgated thereunder at Regulation X, 12 C.F.R. part 1024 ("Regulation

X"); (4) Section 105(a) of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1604(a), and the regulations promulgated thereunder at Regulation Z, 12 C.F.R. part 1026 ("Regulation Z"); and (5) Section 3(b) of the Homeowners Protection Act of 1998, 12 U.S.C. § 4902(b) (the "HPA").

3. Specifically, Plaintiff's mortgage documents included a "Mortgage Insurance Disclosure" form which promised to automatically terminate the Plaintiff's PMI on the "earlier of: 1. The first day of this month after the midpoint date of the loan's amortization period; or 2. The date when the principal balance of your loan reaches 75% of the original value of the property." See Exhibit A. The Defendant breached this promise.

## PARTIES

4. Plaintiff BRIAN SHROPSHIRE is, and at all times relevant hereto was, an individual residing in Brevard County, Florida.

5. Defendant Bank of America is a National Banking corporation that does business in Florida and throughout the United States.

6. BOA is one of the largest mortgage servicers in the United States with a servicing portfolio of $400 billion and more than 2.4 million customers.

## JURISDICTION AND VENUE

7. This Court The Court has subject-matter jurisdiction over this action because it is brought under Federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331.

8. Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 5564(f)

because Defendants are located in or do business in this district and part of the events giving rise to the claims took place in this district.

9. Defendant has sufficient minimum contacts with Florida or otherwise intentionally avails itself of the consumer markets within Florida through the mortgage services it provided in Florida, to render the exercise of Jurisdiction by the Florida courts permissible under traditional notions of fair play and substantial justice.

10. Defendant transacts business within this judicial district, and the business activity described herein is carried out, in part, in this district. Plaintiff Shropshire resides in this County, the action concerns real estate located in this County, and Plaintiff Shropshire was harmed in this district. Venue is therefore appropriate.

## FACTUAL ALLEGATIONS

11. Historically, mortgage lenders viewed an 75% loan-to-value (LTV) ratio as an acceptable standard for making a consumer real estate loan. In other words, a 20% down payment was seen as a prudent requirement to ensure that the lender has sufficient equity in the property in the event the borrower defaulted on the loan.

12. However, as housing prices increased, many prospective buyers were unable to meet the 20% down payment threshold. Lenders charge PMI to decrease the lenders' risk when the consumer's down payment is less than 20%. In essence, PMI covers the difference between the amount a borrower can afford to pay as a down payment and the standard 20% down payment. Accordingly, once the consumer's loan falls within the 75% LTV ration, PMI is no longer necessary.

13. PMI policies typically require the borrower to pay monthly premiums, which are generally added to a borrower's monthly mortgage payment.

14. Plaintiff Shropshire has a residential mortgage loan on his primary residence that is presently serviced by BOA.

15. Plaintiff originally obtained the loan in May 2007 from DEUTSCHE BANK. The value used for the home for purposes of the mortgage was $176,000.00

16. The original Loan to value ratio required PMI, however the refinance in 2013 did not.

17. Because the LTV ration for the mortgage was below 75%, Plaintiff was required to pay for PMI.

18. Pursuant to Plaintiff's PMI agreement, she was required to make a monthly payment of $72.26. This payment was added to Plaintiff's monthly mortgage payment.

19. At the time of the loan was made, Plaintiff received a PMI disclosure from Bank of America. See Exhibit A. The Disclosure informed that the Plaintiff that PMI would automatically terminate if the Plaintiff was current on his payments on the earlier of: 1. The first day of the month after the midpoint date of the loan's amortization period; or 2. The date when the principal balance of your loan reaches 78% of the original value of the property. See Exhibit A.

20. Plaintiff's loan was modified and Plaintiff has always been current and in good standing on his mortgage payments.

21. As of todays date, Plaintiff owes less than $5,000.00 on his loan and in the past 6 months has owed less than $50,000.00.

22. However, BOA failed to terminate Plaintiff's PMI coverage and continued to change Plaintiff the monthly PMI fee of $72.26

23. At that time, Plaintiff contacted BOA requesting that his PMI coverage be terminated. BOA refused this request.

24. Instead of Terminating Plaintiff's PMI on the termination date as promised in the PMI Disclosure form, BOA informed the Plaintiff that his property would need to be currently appraised, at his expense, before BOA would consider terminating his obligation to continue to pay for his PMI coverage.

25. To Date, BOA has not terminated Plaintiff's PMI coverage and continues to charge the Plaintiff $72.26 per month. Plaintiff has been required to continue paying PMI to BOA to avoid default on his loan.

26. On information and belief, based on industry practice, BOA has a financial incentive to continue to change the PMI fees on Plaintiff's loan because it receives a portion of the premium and is covered for risk of default on the loan.

27. On information and belief, BOA conduct towards Plaintiff represents its pattern and practice with respect to terminate of PMI coverage in Florida and nationwide.

28. Plaintiff has been harmed by BOA's conduct in that she has been forced to continue making PMI payments. The FDCPA, RESPA, TILA, and HPA are Federal consumer financial laws. 12 U.S.C. § 5481(14). Under Section 1036 of the CFPA, it is unlawful for any covered person "to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C § 5536(a)(1)(A). Violations of the FDCPA, RESPA, TILA, and HPA are therefore violations of Section 1036 of the CFPA. 12 U.S.C § 5536(a)(1)(A)

29. BOA, orally and in writing, communicated with Plaintiff using inaccurate and incomplete information, including information relating to borrowers' loan terms, amounts received from and owed by borrowers, escrow amounts, insurance amounts.

30. BOA is required to correctly credit borrowers' payments, including any overpayment or partial payments, consistent with the borrowers' mortgage notes and applicable laws, including Regulation Z

31. BOA has routinely failed to send borrowers timely and accurate periodic statements, failed to timely and accurately credit and apply borrower payments, and failed to correct billing and payment errors.

32. Under Regulation Z, a servicer generally must provide a borrower with a periodic statement each month that details, among other things, the amount the borrower must pay that month, how the servicer will break down and apply the borrower's monthly payment, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account. When a servicer receives a full periodic payment for a loan secured by the consumer's principal residence, it must credit the payment as of the date the payment is received unless, among other exceptions, the delay in crediting does not result in a charge to the borrower or negative reporting to a consumer reporting agency

33. Under Regulation X, a servicer is also required to have policies and procedures reasonably designed to ensure, among other objectives, that the servicer is providing accurate and timely disclosures to a borrower as required by applicable law, such as periodic statements required under Regulation Z.

34. In addition to the requirements under Regulation Z and Regulation X, a servicer is prohibited from engaging in unfair, deceptive, and abusive acts and practices related to payment crediting and debt collection activities under the CFPA and FDCPA.

35. BOA has misapplied borrowers' payments and miscalculated borrowers' loan balances and amounts due. Once BOA receives a payment from a borrower, the mortgage contract

specifies how BOA must credit the payment (*e.g.*, to periodic payment, treat such funds as a full periodic payment (*e.g.*, an amount sufficient to cover principal, interest, and escrow, if applicable, for any given billing cycle).

36. BOA errors in crediting borrower payments and use of inaccurate payment information have significantly harmed borrowers This conduct has harmed borrowers financially and caused borrower frustration and emotional distress.

37. RESPA and Regulation X generally require servicers to do the following for escrow accounts that they establish in connection with a federally related mortgage loan: (1) perform an annual escrow analysis to determine the monthly escrow account payments for the next computation year; (2) provide an annual statement reflecting the activity in the escrow account during the escrow account computation year and a projection of the activity in the account for the next year; (3) refund to the borrower any surplus disclosed in an escrow analysis or, if the surplus is less than $50, alternatively credit such surplus against future escrow payments; and (4) potentially seek repayment for any shortage (*i.e.*, the amount by which a current escrow account balance falls short of the target balance at the time of an escrow analysis) disclosed in an escrow analysis.

38. Under HPA, servicers are required to automatically terminate a borrower's requirement to pay PMI on the "termination date," the date when the principal balance of the mortgage is first scheduled to reach 78 percent of the original value of the property or, if the borrower is not current as of the termination date, the first day of the first month beginning after the date that the borrower becomes current on the loan

39. Sections 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531 and 5536(a)(1)(B), prohibit covered persons from engaging "in any unfair, deceptive, or abusive act or practice."

40. Acts or practices are unfair under the CFPA if "the act or practice causes or is likely to cause substantial injury to consumers which are not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c).

41. An act or practice is deceptive if it misleads or is likely to mislead the consumer; the consumer's interpretation is reasonable under the circumstances; and the misleading act or practice is material.

42. Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(B), prohibits covered persons from committing any act or omission in violation of a Federal consumer financial law.

43. Section 1002(14) of the CFPA, 12 U.S.C. § 5481(14), defines the FDCPA, RESPA, TILA, and HPA as Federal consumer financial laws.

44. TILA and its implementing regulation, Regulation Z, at 12 C.F.R. § 1026.36(c)(1), prohibit certain acts and practices and contain certain requirements relating to payment processing in connection "with a consumer credit transaction secured by a consumer's principal dwelling."

45. "Consumer credit" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(12) means, "credit offered or extended to a consumer primarily for personal, family, or household purposes."

46. "Credit" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(14) means "the right to defer payment of debt or to incur debt and defer its payment."

47. A "dwelling" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(19), means a "residential structure that contains one to four units, whether or not that structure is attached to real property. The term includes an individual condominium unit, cooperative unit, mobile home, and trailer, if it is used as a residence."

48. BOA is the servicer of consumer credit secured by consumers' principal dwellings where it services mortgages that have been extended to consumers primarily for personal, family, or household purposes and secure consumers' principal residential structures that contains one to four units

49. As of 2007, Regulation Z generally requires BOA, when it receives a full periodic payment, to credit the payment as of the date of receipt unless the failure to do so does not result in a charge to the borrower or negative reporting. 12 C.F.R. § 1026.36(c)(1)(i).

50. Further, under Regulation Z, BOA must, subject to certain exceptions, provide borrowers with a monthly periodic statement or billing statement detailing information such as the amount due, how BPA will break down and apply monthly payments, all payments received since the last statement, the total of all payments received since the beginning of the current calendar year, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account. 12 C.F.R. § 1026.41(d).

51. In numerous instances since this loans inception, BOA has failed to timely and appropriately credit full periodic payments made by borrowers as of the date of receipt.

52. In numerous instances since 2007, BOA has failed to timely and appropriately credit borrowers' payments it is holding in suspense accounts, where BOA, after an accumulation of sufficient funds to cover a periodic payment in

53. In numerous instances since 2007, BOA has failed to send borrowers periodic statements accurately detailing information such as the amount due, how BOA will break down and apply monthly payments, all payments received since the last statement, the total of all payments received since the beginning of the current calendar year, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account.

54. The acts and practices described in Paragraphs 260-262 constitute violations of 12 C.F.R. §§ 1026.36(c)(1)(i) and (ii), 1026.41(d), and 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

55. Plaintiff further bring this action case against BOA for its failures to secure and safeguard its customers' personal and highly private and confidential information, including names, addresses, account balances, and other personally identifiable information ("PII") WHICH BOA maintains in connection with its banking relationships with its customers, and for failing to provide timely, accurate, and adequate notice to Plaintiffs and other class members that their PII has been compromised.

56. The compromise was the inevitable result of BOA's inadequate approach to data security and the protection of the PII that is collected during the course of its business.

57. BOA disregarded the rights to Plaintiffs by intentionally, willfully, recklessly, or at the very least negligently failing to make adequate and reasonable measures to ensure the PII was protected

58. In addition, BOA exacerbated the injuries Plaintiffs suffered by failing to provide timely notice of the compromise when BOA supposedly learned of compromise.

59. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

a. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the compromise, including searching for fraudulent activity, taking the time to secure or purchasing credit monitoring and identify theft protection services, and the stress, nuisance, and annoyance of dealing with all issues resulting from the compromises;

b. The imminent and certainly impending injury flowing from potential fraud and identify theft the compromise poses and as a result of their personal information being places in the hands of criminals and already misused via the sale of Plaintiffs' and class members' information in the Internet Black market;

c. Money paid for banking services provided by BOA prior to, during, and after the compromise in that Plaintiffs would have taken steps to safeguard their PII had BOA disclosed that it lacked adequate systems and procedures to reasonably safeguard customers' PII; and

d. The loss of Plaintiffs' and the Class members' privacy.

60. These injuries to Plaintiffs and the Class members were directly and proximate caused by BOA failure to implement or maintain adequate data security measures for the PII and other customer data.

61. Further, Plaintiffs and the Class members retain a significant interest in ensuring that their PII and other customer data, which while compromised, remains in the possession of BOA, is protected from further compromises.

62. Without detailed disclosure to BOA's customers, consumers, including Plaintiffs and the Class members, have been left exposed, unknowingly and unwittingly, for months to continued misuse and ongoing risk of misuse of their personal information without being able to take necessary precautions to prevent imminent harm.

63. The ramifications of BOA failure to keep Plaintiffs' data secure are severe.

## CAUSES OF ACTION

## COUNT I

## BREACH OF CONTRACT

64. Plaintiff repeats and realleges the allegations1-63 as set forth above, and incorporated the same as if set forth herein at length.

65. The PMI disclosure provided to the Plaintiff at the inception of their loans become part of their mortgage contract. See Ex. A.

66. BOA failed to comply with these contracts by failing to terminate PMI in accordance with the disclosures.

67. Plaintiff have been injured by reason of Defendant's breach of contract. The injury consists of the amount of insurance premiums the class members were required to pay after their LTV ratio dropped below 75%.

## COUNT II

### UNJUST ENRICHMENT

68. Plaintiff repeats and realleges the allegations 1-63 set forth above, and incorporate the same as if set forth herein at length.

69. Plaintiff brings this court on his own behalf.

70. Plaintiff has conferred upon Defendant an economic benefit, in the nature of profits resulting from unlawful collection on PMI premiums and Defendant's ability to continue to protect itself against perceived risk, to the economic detriment of the Plaintiff.

71. The economic benefits Defendant received through unlawful collection of PMI premiums are a direct and proximate result of Defendant's unlawful practices.

72. The financial benefits derived by Defendant rightfully belongs to Plaintiff, as Plaintiff paid PMI premiums that they were not required to pay, inuring to the benefit of the Defendant.

73. It would be inequitable and violative of the law of the State of Florida for the Defendant to be permitted to retain any of the overcharges for PMI premiums derived from Defendant's unlawful practices alleged in this Complaint.

74. Defendant should be compelled to disgorge all unlawful or inequitable proceeds received by them.

75. Plaintiff has no adequate remedy at law.

### COUNT III
### VIOLATION OF FDUPTA

76. Plaintiff re-alleges and re-adopts paragraphs 1 through 63, as if set forth fully herein and further alleges:

77. The Plaintiff, as a Company engaging in commerce and trade in Florida, is a "consumer" within the meaning and intent of Fla. Stat. §501.203, and is entitled to the protection of said statute from those who engage in unfair methods of competition or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce. This statute is to be liberally construed.

78. The definition of "trade or commerce" under FDUPTA includes the rendering of services mentioned above.

79. Moreover, the Defendants engaged in the offering of a "thing of value" by providing services set forth above. *See* Fla. Stat. § 501.203(8).

80. A violation of FDUPTA may be based upon "any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c).

81. Like FDUPTA, the aforementioned causes of action are designed to protect the consuming public from those who engage in unfair, deceptive or unconscionable acts while rendering services.

82. The Defendants engaged in the following unconscionable acts or practices, and unfair or deceptive acts or practices, in the conduct of the above-referenced trade or commerce:

    a. The Defendants, made the following material representations of fact to the public, knowing of their falsity, with the intent to receive profits for its own personal gain while inducing the Plaintiff to believe:

1. The Plaintiff's modified mortgage would bring him under 75% required for PMI.
2. The Plaintiffs mortgage account, including escrow would be up to date;
3. The Plaintiff's amount currently owed to date is less than $5,000.00

83. The Defendants afore-described, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of the above-referenced trade or commerce, constitute unfair or deceptive acts or practice under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, et. seq.

84. The Defendants are, therefore, in violation of said Act, giving rise to a civil cause of action under which the Plaintiff is entitled to relief.

85. As a direct and proximate result of the Defendants aforementioned misconduct, and in justifiable reliance on these representations, the Plaintiff has been damaged.

WHEREFORE, the Plaintiff demands judgment against the Defendants for damages, together with monetary damages, consequential damages, pre- and post-judgment interest, costs, attorney's fees and such other and further relief as this Court deems just and proper.

## COUNT IV

### BREACH OF IMPLIED CONTRACT

86. Plaintiff restate and reallege paragraph 1 through 63 as if fully set forth herein.

87. BOA solicited and invited Plaintiffs to access and use its financial services. Plaintiffs accepted BOA's offer and provided their PII to access and use BOA financial services during the period of the Data Breach.

88. When Plaintiffs requested information about their loan with BOA's services, they provided their PII, including but not limited to their first and last names, addresses, and other highly sensitive and personal information. In so doing, Plaintiffs entered into mutually agreed-upon implied contracts with BOA, pursuant to which BOA agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and other customers if their data has been breached and compromised.

89. Plaintiffs would have provided and entrusted their PII to BOA to access and use their financial services in the absence of the implied contract between them and BOA.

90. Plaintiffs performed their obligations under the implied contracts with BOA.

91. BOA obligations under the implied contracts were to be executed in Florida.

92. BOA breached the implied contracts it made with Plaintiffs by failing to safeguard and protect their PII, and by failing to provide timely and accurate notice to them that their PII was compromised as a result of the Data Breach.

93. As a direct and proximate result of BOA's breaches of the implied contracts between BOA and Plaintiffs, Plaintiffs sustained actual losses and damages as described in detail above.

## COUNT V

## NEGLIGENCE

94. Plaintiffs restate and reallege paragraph 1 through 63 as if fully set forth herein.

95. Upon accepting and storing Plaintiffs' to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. BOA knew that the PII was private and confidential, and should be protected as private and confidential.

96. BOA owed a duty to care not subject Plaintiffs, along with their PII, to an unreasonable risk to harm because they were foreseeable to probable victims of any inadequate security practices.

97. BOA owed numerous duties to Plaintiffs, including the follow:

    a. To exercise reasonable care to obtaining, retaining, securing, safeguarding, deleting, and protecting PII in its possession;

b. To protect PII using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

c. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

98. BOA also breached its duty to Plaintiff to adequately protect and safeguard their PII by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured PII. Furthering their dilatory practices, BOA failed to provide adequate supervision and oversight of the PPII with which they were and are entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a disgruntled employee and unknown third parties to gather Plaintiffs' PII, misuse that PII, and intentionally disclose it to others without consent.

99. BOA knew, or should have known, of the risks inherent in collecting and storing PII, and the importance of adequate security. BOA knew about numerous, well-publicized data breaches within the banking industry.

100. BOA knew, or should have known, that their data system and networks did not adequately safeguard Plaintiffs' and the Class members' PII in processing information and including other account numbers in reference to the "owner" of the loan.

101. BOA had a special relationship with Plaintiffs. Plaintiffs'willingness to entrust BOA with their PII was predicated on the understanding that BOA would take adequate security precautions. Moreover, Only BOA had the ability to protect its information and the PII it stored in them from unauthorized disclosure.

102.     BOA own conduct also created a foreseeable risk to harm to Plaintiffs, , and their

PII. BOA misconduct included failing to 1) comply with industry standard security

practices; 2) implement adequate system and event monitoring; and 3) implement the

systems, policies, and procedure necessary to prevent this type of data breach.

103.     BOA also independent duties under state and federal laws that required BOA to

reasonably safeguard Plaintiffs' PII and promptly notify them about the Data Breach.

104.     BOA breached its duties to Plaintiffs in numerous ways, including:

a.   By failing to provide fair, reasonable, or adequate computer systems and data security

practices to safeguard Plaintiffs' PII;

b.   By creating a foreseeable risk of harm through the misconduct previously described;

c.   By failing to implement adequate security systems, protocols and practices sufficient

to protect Plaintiffs' PII both before and after learning of the Data Breach;

d.   By failing to comply with the minimum industry data security standards during the

period of the Data Breach; and

e.   By failing to timely and accurately disclose that Plaintiffs' PII had been improperly

accessed by exposed.

105.     Through BOA acts and omissions described in this Complaint, including BOA

failure to provide adequate security and its failure to protect Plaintiffs' PII from being

foreseeable captured, accessed, disseminated, stolen, and misused, BOA unlawfully

breached its duty to use reasonable care to adequately protect and secure Plaintiffs' PII

during the time it was within BOA possession or control.

106.     The law further imposes an affirmative duty and BOA to timely disclose the

unauthorized access and theft of the PII and Plaintiffs so they can take appropriate

measures to mitigate damages, protect against adverse consequences, and thwart further misuse of their PII.

107.    BOA breached its duty to notify Plaintiffs of the unauthorized access by waiting months after learning of the Data Breach to notify Plaintiffs and then by failing to provide Plaintiffs information regarding the breach until October 2018. To date, BOA has not provided sufficient information to Plaintiffs.

108.    Through BOA's acts and omissions described in this Complaint, including BOA failure to provide adequate security and its failure to protect Plaintiffs' PII from being foreseeable captured, accessed, disseminated, stolen, and misused, BOA unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiffs' and the Class Members' PII during the time it was within BOA Possession or control.

109.    Upon information and belief, BOA improperly and inadequately safeguarded Plaintiff's and others PII in deviation of stranded industry rules, regulations, and practices at the time of the unauthorized access. BOA failure to take proper security measures to protect sensitive PII as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access to Plaintiffs' and others PII.

110.    BOA conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to: failing to adequately protect the PII; failing to conduct regular security audits; failing to provide adequate and appropriate supervision of persons having access to Plaintiffs' and others PII; and failing to provide Plaintiffs with timely and sufficient notice that their sensitive PII has been compromised.

111.     As a direct and proximate cause of BOA outlined conduct, Plaintiffs

suffered damages including, but not limited to: damages from lost time and effort to

mitigate the actual and potential impact of the Data Breach on their lives including,

*inter alia,* by placing "freezes" and "alerts" with credit reporting agencies, contacting

their financial institutions, closing or modifying financial accounts, closely

reviewing and monitoring their credit reports and accounts for unauthorized activity,

and filing police reports and damages from identity theft, which may take months if

not years to discover and detect, given the far-reaching, adverse, and

detrimental consequences of identity theft and loss of privacy. The nature of other

forms of economic damage and injury may take years to detect, and the potential

scope can only be assessed after a thorough investigation of the facts and events

surrounding the theft mentioned above.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, pray for judgment and relief on all Causes of Action as follows:

A.  An order enjoining Defendant from pursing the policies, acts, and practices
    complained of herein;

B.  Actual damages;

C.  For pre-judgment interest from the date of the filing this suit;

D.  Reasonable attorney's fees;

E.  Costs of this suit; and

F.  Such other and further relief as the Court may deem necessary or appropriate.

  /s/ MICHAEL A. SARACCO
Michael A. Saracco, Esq.
Florida Bar No. 0099641
520 Brevard Ave,
Cocoa, Florida 32922
msaracco@saraccolaw.com
(321) 505-7542
*Attorney for Plaintiff*